IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-20-0947 |
| RONALD FISHKIND, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

In this suit, Plaintiff Pennsylvania National Mutual Casualty Insurance Company ("Penn National") seeks a declaratory judgment clarifying the precise damages it owes Defendant Lea Gardner in the related case of *Lea Gardner v. Ronald Fishkind, et al.*, Circuit Court for Baltimore City Case Number 24-C-17002357. (Compl., ECF No. 1.) In that suit ("the Underlying Action"), the Circuit Court for Baltimore City found that Ronald Fishkind, Gardner's former landlord, and Penn National, Fishkind's insurer, were liable for $1.53 million in damages to compensate Gardner for injurious lead exposure at her former residence. (*Id.* ¶ 14.) Now pending before the Court are Penn National's Motion for Summary Judgment (ECF No. 27) and Gardner's Cross-Motion for Summary Judgment (ECF No. 28). In these motions, the parties dispute the precise portion of the $1.53 million judgment that Penn National owes Gardner, but their arguments overlook the logical mathematical consequences of their positions. Both motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, the Court will grant Penn National's motion and deny Gardner's cross-motion.

1

## I.  *Background*

In the Underlying Action, the Circuit Court for Baltimore City found that Fishkind and Penn National were liable for Gardner's injurious exposure to lead-based paint at her former residence, 1654 N. Warwick Avenue, Baltimore, Maryland 21216. (Compl. ¶¶ 9, 12; Pl. Ex. 1 at 4, ECF No. 27-2.) Gardner, who was born on January 26, 1997 and resided at 1654 N. Warwick Avenue until August 13, 1998, alleged that she "was exposed to flaking, chipping and peeling lead paint and lead paint dust" from "about January 1997 to approximately 1998[.]" (Compl. ¶ 13; Pl. Ex. 1 at 4, 10; Pl. Ex. 4 at 5, ECF No. 27-6.)[1] At trial, the Circuit Court for Baltimore County found that Gardner displayed an elevated blood lead level ("BLL") from June 18, 1998 to September 3, 1998. (Compl. ¶ 13; Pl. Ex. 6B at 3, ECF No. 27-9.) After this trial, the court found that Fishkind, the owner of 1654 N. Warwick Avenue, as well as Penn National, from whom Fishkind had purchased an insurance policy providing commercial general liability coverage ("the Policy"), were liable for $1.53 million in damages. (Pl. Ex. 2–3B, ECF Nos. 27-3, 27-4, 27-5.)

The present lawsuit primarily concerns the apportionment of the final judgment issued by the Circuit Court for Baltimore City. Penn National alleges that the Policy "reserved its rights" to limit its contractual liability in the Underlying Action based on "Maryland's long recognized pro-rata time-on-the-risk allocation methodology." (Compl. ¶ 10.) Under Maryland law, the pro rata time-on-the-risk methodology is used to apportion how much Penn National owes under the judgment by (1) dividing the time during which Penn National insured the property and Gardner experienced injuries from lead exposure (the "numerator") by the entire time period during which

---

[1] Gardner argues that documents that she filed in the Underlying Action, including her complaint in that suit, "do not constitute evidence under Maryland law," so should not be considered by this Court. (ECF No. 30 at 1.) The Fourth Circuit has held, however, that "the Federal Rules of Evidence, as validly enacted procedural rules, govern in diversity cases." *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 109 (4th Cir. 1995). Gardner does not cite any rules of evidence—Maryland or federal—in support of her assertion, and she makes no attempt to rebut the presumption that "[r]elevant evidence is admissible" under the Federal Rules of Evidence. *See* Fed. R. Evid. 402.

2

Gardner experienced injuries from lead exposure (the "denominator"); and (2) multiplying that fraction by the total amount of the judgment.[2]

Penn National contends that the numerator in the pro rata allocation methodology is the time period from January 26, 1997, when Gardner first moved into the property, to August 1, 1997, when the Policy was terminated. (Compl. ¶ 20.) This totals 187 days. (*Id.*) Penn National argues that the total period during which Gardner experienced injuries due to lead exposure, *i.e.* the denominator, extends from January 26, 1997, Gardner's birth date, until September 3, 1998, the date of Gardner's last elevated BLL. (*See* Mot. Summ. J. Mem. Supp. at 18, ECF No. 27-1.) This period totals 585 days. (*See id.*) Under Penn National's measure, it is liable for 187/585 days, or about 32% of the damages award in the Underlying Action. (*Id.*) Accordingly, on July 15, 2020, Penn National tendered $489,600, which is 32% of $1.53 million, to Gardner. (Pl. Ex. 2 at 2.)

Gardner does not dispute Penn National's numerator calculation, but argues that the denominator should be reduced—thereby increasing Penn National's liability—in two ways. (Cross-Mot. Summ. J. Mem. Supp. at 2.) Gardner first contends that the total period during which Gardner was exposed to the risk of lead paint began not at birth, but at the age of four to six months, when she allegedly began crawling around her home and ingesting lead. (*Id.* at 3.) Second, Gardner argues that the risk period ended on August 13, 1998, when she moved away from 1654 N. Warwick Avenue, rather than on September 3, 1998, the last day on which she registered an elevated BLL. Gardner contends that dividing 187 days—the inexplicably unchanged numerator calculated by Penn National—by her new denominator of between 404 and 465 days would

---

[2] *See Penn. Nat'l Mut. Casualty Ins. Co. v. Jeffers*, 223 A.3d 1146, 1152 (Md. Ct. Spec. App. 2020) ("In calculating Penn National's pro rata share of the judgments, the court was required, first, to identify a numerator (representing Penn National's time on the risk) and a denominator (representing the period in which each child had suffered bodily injury). The court was then required to multiply the resulting ratio or fraction by the total amount of the judgments to determine Penn National's pro rata share.").

3

increase Penn National's share of the judgment to between 40.2% and 46.3%. (*Id.*) Consequently, Gardner alleges she is entitled to receive between $156,060 and $218,790 in additional damages from Penn National. (*Id.* at 4.)

Puzzlingly, Penn National vigorously objects to Gardner's calculation of the denominator (*i.e.*, the duration of Gardner's injuries), apparently without noticing that making Gardner's modifications to the denominator would dramatically decrease the numerator (*i.e.*, the duration of Gardner's injuries during the life of the Policy), and thereby significantly reduce Penn National's liability. This Court, surprised by the parties' lack of awareness of the obvious relationship between the fraction's numerator and denominator, instructed both parties to submit supplemental briefing on this matter. (ECF No. 33.)

Both parties took surprising positions in their supplemental briefing. While acknowledging that Gardner's pro-rata calculation would drastically reduce Penn National's payment to around 1.7% of the judgment, *see infra* Part III.A, Penn National nonetheless insists that it owes 32% of the judgment. (*See* ECF No. 34.) In her briefing, Gardner doubles down on her mathematical error and denies the existence of the clear relationship between the numerator and denominator. (*See* ECF No. 35.) Ultimately, because this Court's role is to adjudicate the parties' dispute in light of the governing law, and not to provide the parties with relief that they never requested, the Court will simply limit itself to considering whether Penn National's 32% payment is justifiable.

## II. *Legal Standard*

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The "mere existence of a scintilla of evidence in support of the [nonmoving

4

party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading, but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge, with such facts as would be admissible in evidence, and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

When faced with cross-motions for summary judgment, the court considers each motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving all factual disputes in the light most favorable to the party opposing that motion. *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014); *cf. Sager v. Housing Comm'n of Anne Arundel Cnty.*, 957 F.Supp.2d 627, 632 (D. Md. 2013) ("When cross-motions for summary judgment demonstrate a basic agreement . . . concerning what legal theories and material facts are dispositive, they may be probative of the lack of a factual dispute.").

### *III. Analysis*

The parties primarily disagree on the appropriate denominator in the pro rata time-on-the-risk allocation methodology. They also dispute whether Penn National's present declaratory judgment action is barred by the unclean hands doctrine, and whether Penn National owes Gardner pre-judgment interest in connection with the Underlying Action. The Court addresses each of these issues in turn, paying particular attention to the parties' underdeveloped views regarding the pro rata allocation fraction.

As a general matter, because this Court's jurisdiction is based on diversity of citizenship (*see* Compl. ¶¶ 2, 4–6), the Court "appl[ies] the same substantive law that a court in Maryland, the forum state, would apply if it were deciding this case." *Penn. Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 111 (4th Cir. 2012) (applying Maryland law to a similar case assessing Penn National's pro rata liability for another party's lead exposure).

### A. *Pro Rata Time-On-The-Risk Calculation*

As discussed above, Penn National's liability is a fraction of the total judgment in the Underlying Action. This fraction is determined by the "pro rata time-on-the-risk" methodology, in which (1) the numerator is the time during which Penn National insured the property and Gardner experienced injuries, and (2) the denominator is the entire time period during which Gardner experienced injuries. *See Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Jeffers*, 223 A.3d 1146, 1152 (Md. Ct. Spec. App. 2020). Under Maryland law, a pro rata allocation is appropriate for assigning damages when more than one party is financially responsible throughout a period of continuous injury. *Rossello v. Zurich Am. Ins. Co.*, 226 A.3d 444, 458 (Md. 2020) (citing *Mayor and City Council of Balt. v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 1102 (Md. Ct. Spec. App. 2002)).

As explained above, the parties inexplicably spend pages of their briefing disputing the proper value of the denominator in this fraction, without considering the obvious fact that changing the denominator affects the numerator as well. Although Penn National does recognize this fact in its supplemental brief, Gardner flatly refuses to accept it. (*See* ECF Nos. 34, 35.)

Put simply, Gardner's argument defies logic. The denominator in this fraction is a measure of the total time during which the risk existed, and the numerator is the time during which the risk existed *and* Penn National insured the property. If the risk began four to six months after Gardner's birth, *both* the numerator and denominator would logically be pushed forward by four to six

6

months. Accepting Gardner's argument that the numerator could begin before the denominator would yield absurd results: If the numerator in a pro rata time-on-the-risk calculation could be greater than the denominator, an insurance company could be held liable for greater than 100% of a judgment.

To illustrate the flaw in Gardner's calculations, if the risk of exposure to lead paint began six months after Gardner's birth, the denominator would decrease by 180 days, falling from 585 to 405 days. This would mean that Gardner's injury did not begin until she turned six months old on July 26, 1997, which is about a week before the Policy terminated on August 1, 1997. Accordingly, the numerator—*i.e.*, the period when the risk existed and Penn National insured the property—would be a period of seven days. As a result, under Gardner's position, Penn National would be liable for only 7/405, or 1.7%, of the total judgment in the Underlying Action.

The Court also wishes to note the oddity of Penn National's position in its supplemental briefing. Although acknowledging that Gardner's position would reduce Penn National's liability from 32% to 1.7% of the judgment in the Underlying Action, Penn National is apparently content to pay 32% of the damages. (*Id.* at ¶ 13.)[3] Regardless of the motivations underlying Penn National's counterintuitive stance, this Court has simply been asked to declare that Penn National does not owe any more than 32% of the damages in the Underlying Action, and for the reasons discussed in this section, the Court is prepared to make that determination.

Overall, the Court need not base its decision on the disturbing discrepancy in Gardner's arithmetic because a blatant discrepancy of a different sort—namely, the difference between Gardner's arguments in state court and this Court—has independently convinced this Court to

---

[3] Perhaps Penn National's counterintuitive position in *this* case is driven by a desire to optimize its expected outcomes across *all* of its cases. *See, e.g., Jeffers,* 223 A.3d at 1154 (noting that Penn National sought to start both the numerator and denominator in the pro rata time-on-the-risk fraction for defendant Tynae Jeffers at her *date of birth*).

7

reject her arguments and accept Penn National's calculation that it owes Gardner 32% of the judgment in the Underlying Action.

First, Gardner argued in the Underlying Action that her injury began at birth, but in the present action, she argues that her injury began four to six months after birth.[4] (*See* Pl. Ex. 4). The Fourth Circuit faced a similar about-face in *Pennsylvania National Mutual Casualty Insurance Company v. Roberts*. There, a plaintiff who was injured by lead exposure argued in Maryland court that this injury began at birth, but when facing Penn National's subsequent declaratory judgment suit in federal court, argued instead that the injury began when she was twenty months old. 668 F.3d at 116. The Fourth Circuit observed that there was "extensive evidence [the injured plaintiff] Roberts herself provided in the state trial indicating that she had been exposed to lead poisoning since her infancy," yet "when it came time to divvy up that judgment, [Roberts] changed her tune." *Id.* at 116–17. That court warned that "the judicial process is not some kind of game," and without definitively holding that the doctrine of judicial estoppel barred Roberts' later argument that lead exposure began when she was twenty months old, concluded that "at the very least Roberts's previous position undermines the credibility of her current argument." *Id.* at 117. (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)) (defining judicial estoppel as, "[i]f a litigant 'assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary

---

[4] In an attempt to reconcile her contradictory positions in the Underlying Action and her pending Cross-Motion for Summary Judgment, Gardner now argues that the testimony of Dr. Paul Rogers, her expert witness in the Underlying Action, "can only be reasonably read as opining that infants at 4-6 months first have injurious lead exposure." (Cross-Mot. Summ. J. Mem. Supp. at 4.) In the Underlying Action, however, Dr. Rogers testified that children may begin ingesting lead before the age of nine months, and in support of that statement, described a study that showed that four-month-old infants can be exposed to lead. (*See* Def. Ex. 1 at 98–99, ECF No. 28-1.) Testimony establishing that an infant *may* be able to ingest lead at four months of age cannot be equated with testimony affirmatively stating that Gardner, the specific child at issue, *was not* exposed to lead prior to four months of age.

8

position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him'").

The facts in *Roberts* are analogous to those here, and the reasoning in that case is applicable here as well. Restricting Penn National's liability to its time on the risk means that the numerator of the pro rata fraction extends from Gardner's birth until Fishkind's insurance policy terminated on August 1, 1997, a calculation to which Gardner does not object. The denominator should likewise begin on January 26, 1997, the date of Gardner's birth. The Court need not conclusively decide that judicial estoppel bars Gardner's arguments about the denominator in the present suit; beginning the denominator on her date of birth is the logical approach in light of both Gardner's arguments in the Underlying Action and the Fourth Circuit's reasoning in *Roberts*.

With respect to the *end* of the time period covered by the denominator, Gardner does not cite any authority supporting her position that the denominator—which is defined as the time during which Gardner "suffered bodily injury,"[5] *see Jeffers*, 223 A.3d at 1152—should exclude a portion of the time during which she *experienced an injury* in the form of an elevated BLL.[6] Gardner discusses *Jeffers*, but that case supports the measure of the denominator put forward by Penn National. In *Jeffers*, the Maryland Court of Special Appeals held that, for purposes of calculating the denominator in the pro rata time-on-the-risk allocation methodology, the trial court "erred in ruling that the children's bodily injury ended when they moved out of the [property at

---

[5] The denominator is supposed to measure the total "period in which [the] child had suffered bodily injury," or equivalently, the total time during which Gardner remained injured by the lead paint to which she was exposed at 1654 N. Warwick Avenue. *See supra* Part I; *Jeffers*, 223 A.3d at 1152.

[6] In arguing that the denominator should end on August 13 rather than September 3, 1998, Gardner asks this Court not to employ the pro rata allocation methodology described above. (*See* Cross-Mot. Summ. J. Mem. Supp. at 10). In *Roberts*, however, the Fourth Circuit unequivocally held that a pro rata time-on-the-risk allocation methodology is applicable to cases, such as this one, that involve multiple tortfeasors. 668 F.3d 106, 113–14. Because Gardner's argument for rejecting the pro rata allocation methodology is inconsistent with the Fourth Circuit's holding in *Roberts*—a holding that Gardner simply dismisses as being "incorrect" and "ridiculous"—this Court is unpersuaded by Gardner's argument. (*See* Cross-Mot. Summ. J. Mem. Supp. at 11.)

9

issue], and not *at the time of their last elevated blood-lead levels*[.]" 223 A.3d at 1158 (emphasis added).

Moreover, Gardner's arguments about excluding the date of her last elevated BLL from the denominator are inconsistent—even if not outright contradictory—with her arguments in state court. In the Underlying Action, Dr. Rogers testified that Gardner had an elevated BLL on June 18, 1998 and that her BLL was slightly lower, but still elevated, on September 3, 1998. Dr. Rogers testified that he used both of those BLLs to calculate Gardner's estimated IQ loss, an injury resulting from her lead exposure. (*See* Ex. 6A at 18–20, ECF No. 27-8; Ex. 6B at 3–4.) In sum, extending the denominator until the last day when Gardner displayed an elevated BLL is both logical and consistent with Maryland law.

Based on the undisputed facts in this case, the Court concludes that the denominator in the pro rata time-on-the-risk allocation methodology should begin at Gardner's birth and end when she last registered an elevated BLL. Thus, Penn National is entitled to summary judgment in its favor on this issue.

### B. Unclean Hands Doctrine

As an affirmative defense, Gardner argues that Penn National has "unclean hands" because "Penn National has never paid nor offered to pay the post-judgment interest" on the damages award issued in the Underlying Action. (Cross-Mot. Summ. J. Mem. Supp. at 7.) Maryland's unclean hands doctrine provides that "courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance." *Wells Fargo Home Mortg., Inc. v. Neal*, 922 A.2d 538, 552 (Md. 2007).

Although Gardner argues that the unclean hands doctrine applies to this case because "declaratory judgment is an equitable remedy," this Court recently reached the contrary conclusion in *Pennsylvania National Mutual Casualty Insurance Company v. Kirson*, Civ. No. TDC-18-3275, 2021 WL 979129 (D. Md. Mar. 16, 2021). In that case, Judge Chuang explained that "[a]ctions for declaratory judgments are neither legal nor equitable, so determining whether a declaratory judgment action is a suit at law or in equity requires look[ing] to the kind of action that would have been brought had a declaratory judgment remedy not been available." *Kirson*, 2021 WL 979129, at *6 (internal quotation marks and citations omitted). Based on this analysis, Judge Chuang concluded that a declaratory judgment action brought to ascertain what portion of the judgment in an underlying action the plaintiff must pay the defendant "most closely resembles a breach of contract claim, which is an action at law, not in equity." *Id.* Accordingly, Judge Chuang rejected the defendants' unclean hands defense. For the same reason, this Court likewise concludes that the unclean hands doctrine does not bar Penn National from seeking a declaratory judgment in the suit at issue.

### C. Pre-Judgment Interest

Finally, Gardner seeks to recover pre-judgment interest in *this* action on the post-judgment interest that Penn National still allegedly owes her in the *Underlying* Action. Gardner argues that Penn National owes her interest on the $1.53 million judgment in the Underlying Action because in *Jeffers*, the Maryland Court of Special Appeals held that the defendant insurance company must pay post-judgment interest on the entire judgment—not just the portion of the judgment for which that defendant is liable. (Cross-Mot. Summ. J. Mem. Supp. at 8 (citing *Jeffers*, 223 A.3d at 1163, 1165 (explaining that "at least until it has paid or tendered the limits of its liability or deposited that sum into court," an "insurer remains liable for all post-judgment interest"—which is interest

11

on the entire judgment, rather than "only on the portion of the judgment that is within the insurer's limits of liability").)

The interest on the $1.53 million judgment, which is post-judgment interest with respect to the Underlying Action, would constitute *pre*-judgment interest in the present case. Under Maryland law, pre-judgment interest is recoverable when "the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date." *Harford Cnty. v. Saks Fifth Ave. Distrib. Co.*, 923 A.2d 1, 13 (Md. 2007) (internal quotation marks and citations omitted).

In *Kirson*, the District of Maryland concluded that pre-judgment interest could not be recovered in a declaratory judgment action for two reasons. First, because the parties' dispute centered on "whether the pro rata allocation approach applies and how it applies," the precise amount that the plaintiff owed the defendant was necessarily uncertain. *Kirson*, 2021 WL 979129, at *7. Second, because neither the plaintiff's complaint nor the defendants' answers mentioned post-judgment interest, this issue was not properly within the scope of the parties' summary judgment motions. *Id.*

Because both of those reasons apply here as well, this Court finds *Kirson* persuasive. As in *Kirson*, the parties to this declaratory judgment suit disagree over how much of the $1.53 million judgment must be paid by Penn National, or in other words, how the time-on-the-risk pro rata allocation methodology applies to the facts of this case. As a result, the total damages award that Penn National allegedly owes Gardner is inherently uncertain pending the resolution of the present

declaratory judgment action.[7] Further, the issue of pre-judgment interest does not properly factor into this Court's summary judgment analysis because it was not raised in either party's pleading.[8]

Accordingly, this Court will not resolve the issue of post-judgment interest in the Underlying Action, and the closely related issue of pre-judgment interest in this action. Now that this Court has issued a dispositive decision in the present case, Gardner may seek any post-judgment interest that Penn National still owes her under *Jeffers*'s rule through the state court case between these parties.

### IV.  Conclusion

For the foregoing reasons, an order shall enter granting Penn National's Motion for Summary Judgment (ECF No. 27) and denying Gardner's Cross-Motion for Summary Judgment (ECF No. 28). Accordingly, the Court hereby issues a declaratory judgment that Penn National does not owe Gardner more than 32% of the damages award in the Underlying Action.

DATED this 25 day of May, 2021.

BY THE COURT:

/s/ James K. Bredar

James K. Bredar
Chief Judge

---

[7] Gardner points out that, even if Penn National's liability is uncertain, it is certain and definite that Penn National must pay interest on the full $1.53 million damages award. This Court sees no reason to deviate from the reasoning in *Kirson* by holding that, when a portion of the damages is already certain, but a different portion is still uncertain, the entire damages award is sufficiently certain that Penn National must pay pre-judgment interest on it.

[8] This Court recognizes that it previously deferred ruling on the issue of post-judgment interest and said that "Gardner may seek determination on the post-judgment interest issue" in a dispositive pre-trial motion. (*See* ECF No. 24 at 2.) However, the Court did not guarantee that it would rule on this issue at the summary judgment stage. The Court has since considered the issue more fully, with the benefit of the parties' briefing and the recent opinion in *Kirson*, and determined that the issue of post-judgment interest is not properly before it in this case.